| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FRANCISCO VELAZQUEZ, JR.,<br><br>Defendant. | Case No. 6:17-mj-00094-MJS-1<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS<br><br>(Doc. No. 10.) |

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Defendant Francisco Velazquez, Jr., is charged with three misdemeanor counts stemming from an incident in the Yosemite National Park campground known as Camp Four. He moves to suppress statements that he made while handcuffed and under questioning by National Park Service rangers. The rangers, who were responding to reports of gunfire, did not give a *Miranda* warning, and the court must decide whether the public-safety exception to the *Miranda* rule permitted any of their questioning. The parties have fully briefed the issues, and the court has heard argument on the motions.[1] The court will grant in part and deny in part the defendant's motion to suppress.

---

[1] The court previously denied the government's request for an evidentiary hearing, since the relevant facts are undisputed. (Doc. No. 20.)

1

**I.**

Shortly after midnight on September 13, 2017, two women came to the Yosemite Law Enforcement Office and reported that they had fled their tent in Camp Four after hearing gunshots and yelling.[2] Rangers J. Wentz, B. Bonner, and T. Healey responded to Camp Four, carrying long guns and with body-mounted cameras activated. Shortly after the rangers reached the campground, they encountered the defendant seated at his campsite and asked him whether he had heard a gunshot or other noise. The defendant said he had not, and the rangers left.

Over the next few minutes, the rangers searched Camp 4, looking for evidence of a disturbance. The campground, however, appeared calm, which did not square with the report of gunfire that they had received. If there had been gunshots, "why wouldn't the 911 line be lit up for this," wondered Ranger Bonner.

Another ranger commented that the campground was "way too quiet."

Ranger Bonner stated in what sounded like a radio transmission that the rangers had received "a specific report about . . . four gunshots . . . and an individual screaming that he was going to kill someone," but, he said, "we're not seeing any commotion" and "nobody's heard anything so far."

The rangers then spoke to other park visitors, who were in their tents. In answer to a question from Ranger Bonner, a female visitor said that she had heard a disturbance. "I'm not sure what it was," she said, "but . . . another guy told me that they were throwing, like, cans into the fire." She added that the cans "were, like, exploding." She described the individual involved—a male matching the defendant's general description—and his location, which seemed to match the defendant's approximate location.

Other visitors also told the rangers that they had heard noises. One visitor told Ranger Healy that the noises "sounded like gunfire to him."

---

[2] The defendant states in his motion that the rangers arrived at his campsite at around 12:12 a.m. but cites no evidence in the record to support this arrival time. Ranger J. Wentz's General Report states that the women came to the Yosemite Law Enforcement Office at 12:12 a.m. (*Compare* Doc. No. 10-1, at 2, *with* Doc. No. 10, at 6.). The court will rely on Ranger J. Wentz's General Report. The slight discrepancy in timing does not appear to be significant.

2

1       "Alright," Ranger Bonner said to the other rangers, "well let's go deal with that guy." He
2 proposed that another ranger take the lead in questioning the defendant. "I'll watch your back
3 and get this squared," he said. The rangers returned to the defendant's location. As the other
4 rangers spoke to the defendant, Ranger Bonner walked around the campsite, illuminating it with
5 his flashlight.
6       Rangers Healy and Wentz asked the defendant to turn off his music. Ranger Wentz then
7 asked the defendant, "where are the guns?" The defendant, who appeared intoxicated, denied
8 having firearms. Ranger Wentz asked the defendant whether he had identification and when
9 defendant reached into his pockets, told him to "stop digging in [his] pockets." Ranger Wentz
10 asked the defendant to "go ahead and put your hands behind your back," and he and another
11 ranger handcuffed the defendant.
12       Ranger Bonner told the defendant, "we're going to check and make sure you don't have
13 any weapons, okay?"
14       The defendant again denied having weapons and asked, "what did I do wrong?"
15       "We're just checking for now," answered Ranger Bonner.
16       "Okay—I mean, honestly, I'm sitting here, enjoying—this is my last day," continued the
17 defendant.
18       "Hey," said Ranger Bonner to one of the other rangers, "bring him back way from the
19 fire—there's, um, several compressed cannisters . . . . That's probably what it is."
20       Moments later, Ranger Wentz asked the defendant to "Go ahead and have a seat, bro—sit
21 down." After removing the defendant's cell phone from his pocket at the defendant's request, the
22 rangers helped the defendant take a seat.
23       The defendant thanked the rangers for their help, but said the situation was "kind of
24 ridiculous."
25       "We got a report of gunfire, man—this is the way it's gonna go for now," said Ranger
26 Wentz.
27       "Well, well—" said the defendant, "I, I could, I'll, I give you, I'll let you guys search
28 whatever you want."

1  Ranger Bonner then asked the defendant whether he was here by himself. The defendant answered in the negative, explaining that he was with his girlfriend, who was in the tent behind him. Ranger Bonner then identified the girlfriend's tent.

"Dude—" said the defendant, "I, I, I swear to God on my life I have no guns."

"I understand," said Ranger Bonner. The defendant uttered a curse in response, and Ranger Bonner told him "We're just trying to get—we're just trying to put together the whole scene."

The defendant then began to describe his day: "It's my last day here," he reiterated, "and I'm sitting here by the fire."

"Alright," said Ranger Bonner. "Just—just understand we're trying to put together all the puzzle pieces here," he said.

"I understand, okay?" said the defendant. "As soon as you guys figure it out, [the handcuffs] will be off, right?" he continued—"'cause I haven't done anything wrong."

Ranger Wentz then inquired whether Ranger Bonner had adequately frisked the defendant. Ranger Wentz appears to have concluded that the defendant had yet to be adequately frisked; he asked the defendant to stand up and checked him for weapons.

"You guys can search my tent—" said the defendant, "you can search my truck that's in the parking lot, too." Seconds later, he continued: "You guys—I, I, I give you full permission; I have no firearms."

Rangers Bonner and Wentz both posed questions to the defendant. Ranger Bonner asked the defendant whether his girlfriend was sleeping. Ranger Wentz asked the defendant, again, for his name. After Ranger Wentz finished frisking the defendant, Ranger Bonner asked the defendant whether "any of those bottles explode[d] when they were in the fire."

The defendant responded that he had a Coors Light bottle. He then began to talk about some other park visitors that apparently had irritated him. "But you know what?—they were doing this all night," he said. "Honestly, they were saying—I'll be honest—they were teaching Jihad over there the other night and I felt pissed off." Ranger Wentz asked the defendant to sit down, but the defendant kept talking: "Might want to let them know, this is America," he said.

4

Shortly thereafter, the defendant told Ranger Wentz that a "Coors Light can" had burst in the fire, probably creating a loud noise.

The rangers' questioning continued for some time. The rangers did not give a *Miranda* warning. Eventually, the rangers escorted the defendant away. Defendant now faces three counts:

- **Count I**: 36 CFR § 2.34(a)(2): Using a language, utterance, or gesture, or engages in a display or act that is obscene, physically threatening or menacing, or done in a manner that is likely to inflict injury or incite an immediate breach of the peace.

- **Count II:** 36 CFR § 2.35(c): Being present in a park area while under the influence of alcohol or a controlled substance to a degree that may endanger oneself or another person or damage property or park resources.

- **Count III:** 36 CFR § 2.10(b)(4): Creating or sustaining unreasonable noise between the hours of 10:00 p.m. and 6:00 a.m., considering the nature and purpose of the actor's conduct, impact on park users, location, and other factors which would govern the conduct of a reasonably prudent person under the circumstances.

## II.

The single question facing the court is whether the public-safety exception permits admission into evidence of any of the defendant's statements made while in custody.[3] Generally, under *Miranda v. Arizona*, "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant" unless a *Miranda* warning or equivalent is provided to the defendant before any questioning. 384 U.S. 436, 444 (1966). This exclusionary rule protects the Fifth Amendment's guarantee that "[n]o person shall be compelled in any criminal case to be a witness against himself." *Miranda* generally excludes statements made during custodial interrogation based on the idea "that interrogation in certain custodial circumstances is inherently coercive"—and any statement by a defendant in such circumstances is inherently compelled in violation of the Fifth Amendment "unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights." *New York v. Quarles*, 467 U.S. 649, 654 (1984).

---

[3] The parties do not dispute that the defendant was in custody once the rangers placed him in handcuffs, or that the rangers provided no *Miranda* warning or equivalent procedural safeguard.

5

The public-safety exception, established by the Supreme Court in *New York v. Quarles*, is a "narrow exception" to the *Miranda* rule that applies when "overriding considerations of public safety justify [an] officer's failure" to give *Miranda* warnings before questioning a suspect. *Id.* at 651. In such circumstances, the Supreme Court held, "the need for answers to questions . . . outweighs the need for prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657. In evaluating whether the public-safety exception applies to questioning by law enforcement officers, courts have considered: "(1) did the questioning officer face immediate danger, (2) was the question itself non-investigatory in nature, and (3) did the officer cease questioning the defendant or did the officer seek more information." *United States v. Castaneda*, 196 F. Supp. 3d 1065, 1073 (D. Ariz. 2016); *accord United States v. Williams*, 842 F.3d 1143, 1149 (9th Cir. 2016); *United States v. Brady*, 819 F.2d 884, 888 (9th Cir. 1987). Although *Quarles* obligates courts to consider the circumstances post hoc, "officers' actions must be analyzed according to the demands of the moment rather than hindsight analysis." *United States v. Reilly*, 224 F.3d 986, 993 (9th Cir. 2000).

No specific time limit curtails application of the public-safety exception, but the rule is founded on a notion of "exigency," *Quarles*, 467 U.S. at 658.; *Allen v. Roe*, 305 F.3d 1046, 1051 (9th Cir. 2002) (reasoning that public-safety exception continue to apply if circumstances "pose[] a continuing immediate danger"). The Supreme Court noted that officers must make decisions "often in a matter of seconds." *Id.* at 657. In such circumstances, "spontaneity rather than adherence to a police manual is necessarily the order of the day." *Id.* at 656. The Court reasoned that "police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public" and more routine investigatory questions. *Id.* at 658-59.

In this case, the rangers began with questions—starting with "where are the guns?"—squarely focused on public safety, and this questioning occurred in the context of an emergency. The rangers had received reports of gunshots, and the campground was dark and occupied by multiple park visitors. By the end of the questioning, though, the emergency had dissipated, and

the rangers' questions had evolved into purely investigatory inquiries. The court must decide when during the questioning process the public-safety exception ceased to apply.

The public-safety exception comes into play only when a defendant is in custody, and so, here, the exception did not apply before the rangers asked the defendant to place his hands behind his back and handcuffed him. Nonetheless, to understand the defendant's statements after he was handcuffed, it is useful to consider the questions that preceded his handcuffing. Moments before handcuffing the defendant, Ranger Wentz asked him, "Where are the guns"? After the defendant responded that he had would never bring a firearm to Yosemite, Ranger Wentz told him, "We're getting a report of gunfire coming from this area."

Continuing in this same vein, Ranger Bonner said to the defendant, as the defendant was being handcuffed, "We're going to check and make sure you don't have any weapons, okay?" When the defendant responded by promising that he did not have weapons, Ranger Bonner said, "Okay, just checking to make sure," and when the defendant then inquired what he had done wrong, Ranger Bonner said, "We're just checking for now."

The defendant responded by stating, "Okay, I mean, honestly, I'm sitting here, enjoying—this is my last day."

Up to this point, the rangers' questioning was narrowly focused on public safety and the safety of the rangers, and fell within the public-safety exception—considering the reports of gunfire that had been received by the rangers and the open, dark, uncontrolled campground environment. Although the scene that greeted the rangers at Camp 4 was calmer than they had expected, the rangers were reasonable in their concern for public safety, and the initial safety-focused questions were reasonable in light of this concern.

After the defendant's statement about enjoying his last day in the park, Ranger Bonner asked that the defendant be brought away from the fire, noting that there appeared to be "several compressed cannisters" in the fire. "That's probably what it is," Ranger Bonner said a moment later. The rangers then brought the defendant away from the fire, and Ranger Wentz had him sit down, accommodating the defendant's request that the rangers move his cell phone so that it would not be at risk of breaking.

Ranger Wentz explained to the defendant that the rangers were responding to "a report of gunfire," and that "this is the way it's gonna go for now."

The defendant then offered consent to the rangers to "search whatever you want."

At this point, the situation had changed, and the court finds that the public safety exception no longer applied. While the situation was far from perfectly safe, the emergency had passed. The rangers had identified a single suspect, and that suspect—handcuffed and seated in a secure location—was cooperating and even volunteered consent for a full search of his campsite. Ranger Bonner had also identified an alternative, less alarming explanation for the reported gunfire: exploding cannisters of some sort—an explanation that comported with some hearsay statements that had been relayed to the rangers a few minutes beforehand. And Ranger Bonner had swept much of the campsite, illuminating dark areas with his flashlight and, as he had put it, watching the other rangers' backs. *See United States v. McKee*, 157 F. Supp. 3d 879, 892 (D. Nev. 2016) ("The public-safety exception applies to statements Defendant made before the officers restrained Defendant, took control of the knives, and did a sweep of the home.").

A shift in the questioning also occurred at this point, with Ranger Bonner asking whether the defendant was alone, and then, when told that the defendant was with his girlfriend, asking where she was located. While such questions may have been motivated in part by an interest in safety, they prompted the defendant to make general comments about the incident. Ranger Bonner's subsequent statements suggest that he was trying to get a full picture of the incident: "We're just trying to put together the whole scene, here," he said to the defendant—continuing moments later, "Just, just understand we're trying to put together all the puzzle pieces here." Ranger Bonner's statements, though not phrased as questions, prompted the defendant to tell the rangers what had happened. They functioned as open-ended inquiries—not the sort of narrowly-focused, firearms-related questions that the rangers had asked when they had approached the defendant a short time earlier. And the defendant indeed responded with testimonial statements: an account of the incident interspersed with further denials that he had any weapons.

Notably, the rangers' interrogation of the defendant continued for several additional minutes, and the rangers gave no *Miranda* warning—in contrast to the situation in *Quarles*, in

8

which officers provided a *Miranda* warning once initial, safety-related questions had been resolved. *See* 467 U.S. at 652. Additionally, in further questioning, the rangers asked the defendant open-ended questions, including, "What occurred today that ended up with us here?"; "Clearly I didn't pick you out of a crowd, sir. Okay?"; "[W]ere you yelling?"; and "[Y]ou threw it chuck in the fire here?" These questions are inquiries that would "likely elicit . . . incriminating response[s]." *McKee*, 157 F. Supp. 3d at 891.

The defendant, for his part, appears to have been induced to make incriminating statements at least in part by the fact that he was in custody—asking, shortly after his handcuffing, "As soon as you guys figure it out, [the handcuffs] will be off, right?"

The situation is somewhat complicated by the fact that Ranger Wentz, who took the lead role in questioning the defendant, continued to ask safety-related questions after Ranger Bonner had shifted to more general interrogation. Specifically, Ranger Wentz insisted on a careful frisking of the defendant and said, "Okay, so no weapons on you right now, sir?" He then told the defendant, again, that the rangers had received a report of gunfire, and asked, "Okay, no guns at all in your car, your tent, nowhere"? Receiving a negative response, he asked the defendant "what caused a big boom"? Ranger Wentz appeared concerned that explosive cannisters of some type might be in the fire—another possible safety risk.

These questions from Ranger Wentz, had they occurred in isolation, might qualify for the public-safety exception. In this case, however, the defendant was taking questions from both Rangers Wentz and Bonner. Even if, from the rangers' perspective, Ranger Wentz led the questioning, the defendant heard questions and statements from both rangers, and was reasonably prompted by Ranger Bonner's statements to make incriminating, testimonial statements about the events leading up to his handcuffing. Indeed, the defendant ignored Ranger Wentz's questions about possible exploding bottles and launched into an account of how certain other park visitors had irritated him by, in his words, "teaching Jihad over there the other night."

In conclusion, the public-safety exception is a narrow one, and—although it has some application here—its reach is limited. The public-safety exception applies to the rangers' initial exchanges with the defendant focused on the possible presence of firearms, but it does not permit

introduction at trial of the defendant's statements made after the rangers had identified a single suspect; made a safety sweep of the campsite; moved the defendant away from the fire; arranged for him—already in handcuffs—to sit down in a safe area; identified a likely, nonlethal cause for the reported loud noises; and asked questions that prompted incriminating, testimonial statements. After this point, the threat to public safety had dissipated and a *Miranda* warning was appropriate.

### III.

The court finds that statements made by the defendant following Ranger Wentz's direction that he "Go ahead and have a seat" are inadmissible.

For the reasons stated above, the defendant's Motion to Suppress (Doc. No. 10) is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

Dated: August 6, 2018

_____
UNITED STATES MAGISTRATE JUDGE